FILED
United States Court of Appeals
Tenth Circuit

February 28, 2022

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JEANNE STROUP; RUBEN LEE,

    Plaintiffs - Appellees,

v.

                          No. 19-1373

UNITED AIRLINES, INC.,

    Defendant - Appellant.

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CV-01389-DDD-STV)**

---

David Lane (Liana Orshan with him on the brief), Killmer, Lane & Newman, LLP, Denver, Colorado, for Plaintiffs-Appellees.

Marcy G. Glenn, Holland & Hart LLP, Denver, Colorado (Jessica E. Whelan, Holland & Hart LLP, Las Vegas, Nevada; Meghan W. Martinez and Elizabeth Imhoff Mabey, Martinez Law Group, P.C., Denver, Colorado, with her on the briefs), for Defendant-Appellant.

---

Before **HOLMES**, **BRISCOE**, and **CARSON**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

    Defendant-Appellant United Airlines ("United") appeals from the district

court's denial of its motion for judgment as a matter of law ("JMOL"), pursuant to

Federal Rule of Civil Procedure 50, and its motion for new trial, pursuant to Federal Rule of Civil Procedure 59. A jury found that United discriminated against two flight attendants, Plaintiffs-Appellees Jeanne Stroup and Ruben Lee (collectively, the "Plaintiffs"), by terminating them because of their ages in willful violation of the Age Discrimination in Employment Act ("ADEA"). United filed its JMOL and Rule 59 motions with the district court, contending, among other things, that the jury's verdict was based on legally insufficient evidence and the court erred in admitting Plaintiffs' testimony about their emotional distress. The district court denied the motions.

United maintains this denial was error. United contends that (1) the district court erred in denying its JMOL motion because (a) there was insufficient evidence to support the jury's finding that United discriminated against Plaintiffs because of their ages in violation of the ADEA, and (b) similarly, there was insufficient evidence to support the jury's finding that United acted willfully in committing any ADEA violation; and (2) the court abused its discretion and committed reversible error when it admitted Plaintiffs' allegedly irrelevant and highly prejudicial emotional distress testimony.

We conclude there was sufficient evidence for the jury to reasonably find that, not only did United violate the ADEA by discriminating against Plaintiffs, but it did so willfully. We also determine that the district court did not commit reversible error by admitting the challenged emotional distress testimony. Thus,

2

we uphold the district court's denial of United's JMOL motion and Rule 59 motion for a new trial and **affirm** its judgment.

# I

Ms. Stroup and Mr. Lee were flight attendants who had worked for United for decades.  Both, generally, had rendered good service in their years of employment and had received only minor discipline.  At times material here, Plaintiffs were based out of the Denver International Airport.

Plaintiffs' terminations stem from a complaint against them from their fellow flight attendant, Sheila Simms.  In August 2013, Ms. Simms contacted Mark Dodge, Plaintiffs' supervisor, to complain about Plaintiffs' conduct on a flight that occurred a few days before.  Ms. Simms alleged that Plaintiffs "watched a video on an iPad when they were on-duty."  Aplt.'s Opening Br. at 8.  United's Flight Attendant Information Manual ("FAIM"), which "contains the policies, procedures and service standards for all . . . flight attendants," Aplt.'s App., Vol. VII, at 1758, prohibits the use of "personal electronic devices" by flight attendants "on board the aircraft while customers are present," *id.* at 1849.

Mr. Dodge escalated the issue by emailing Dean Whittaker, United's Manager of In-Flight Services at Denver International Airport and the ultimate decision-maker as to Plaintiffs' employment.  In response, Mr. Whittaker "asked Deepesh Bagwe, a California-based supervisor, to anonymously observe [the] Plaintiffs' job performance, including whether they would again watch a video

3

while on-duty." Aplt.'s Opening Br. at 9. Mr. Bagwe's observation happened while Plaintiffs were working a short flight between Denver and San Francisco roughly five weeks after Ms. Simms's complaint.[1]

On that flight, Mr. Bagwe catalogued several policy violations. First, Mr. Bagwe photographed Plaintiffs sitting on carrier boxes—"steel containers for stowing items in galleys"—and also sharing a pair of earbuds and watching a video on an iPad. *Id.* at 9–10 (citing Aplt.'s App., Vol. XIV, at 3292–93 and Aplt.'s App., Vol. V, at 1188).[2] Much like the video watching, Plaintiffs' use of the carrier boxes also violated the FAIM. Next, Mr. Bagwe observed Mr. Lee smoking an e-cigarette during the flight in violation of United policy. Mr. Bagwe also observed other, "less major" policy violations, such as (1) Mr. Lee not being "properly positioned" during his safety demonstration at the beginning of the flight; (2) Plaintiffs' rushed and incomplete beverage services; (3) Plaintiffs' failure to wear their aprons and name-tags; (4) Mr. Lee's giving of a free alcoholic beverage to a customer; and (5) Plaintiffs' failure to comply with sanitation procedures for the water service. *See id.* at 13–14.

---

[1] Plaintiffs flew and worked flights together between the time of the complaint and the time of Mr. Bagwe's investigation, but they were not observed on those flights by United supervisors.

[2] Plaintiffs contend they watched the video intermittently and only for a total of about five total minutes, while Mr. Bagwe testified that Plaintiffs watched the video uninterrupted between ten and twenty-five minutes.

4

Under the requirements of the collective bargaining agreement that governed the employment relationship between United and Plaintiffs, Mr. Dodge met with Plaintiffs and their union representative, Ken Kyle, to discuss the policy violations. Coming out of that meeting, Mr. Dodge apparently thought both Plaintiffs were dishonest based on their responses to his questions.[3]

After follow-up meetings and more investigation, Mr. Dodge issued Letters of Charge to Plaintiffs. Under the governing collective bargaining agreement, "termination of a flight attendant could not be based on violations other than those listed in a Letter of Charge." Aplees.' Resp. Br. at 7.[4]

Ms. Stroup's Letter of Charge stated that "[her] actions" on Mr. Bagwe's observational flight were "inconsistent with [United's] Working Together Guidelines" in specified ways. *See* Aplt.'s App., Vol. V, at 1181. First, "[w]ith respect to Professionalism and Responsibility, [she was] observed on two separate occasions by [Mr.] Bagwe watching and listening to a video on an [iPad] in a cart

---

[3]    While Plaintiffs disagree on the particulars of United's account of events, Plaintiffs do admit that their statements to Mr. Dodge about the specifics of their iPad usage and video watching were "not true." Aplees.' Resp. Br. at 21 n.4.

[4]    *See also* Aplt.'s App., Vol. XIII, at 3150 (Tr. Ken Kyle Test., dated Feb. 28, 2018) (asked by Plaintiffs' counsel, "And [United] can't—can they go beyond the letter of charge to fire somebody?" Mr. Kyle responded, "Not in the process, no."); *id.* at 3185 (asked by United's counsel, "under the collective bargaining agreement, [United is] not permitted to go outside the four corners of the letter of charge to come up with reasons for termination; is that correct?" Mr. Kyle responded, "For what had occurred previously, correct. It does not cover what happens at the letter of charge hearing.").

while seated on a carrier box in the aft galley." *Id.* "In addition to being unavailable and inattentive to . . . customers during this time, [Ms. Stroup was] observed using ear phones and a personal electronic device onboard the aircraft," in violation of FAIM policies. *Id.* "Additionally," Ms. Stroup "did not follow uniform guidelines when [she] failed to wear [her] apron and [her] name bar during the flight." *Id.* The Letter also noted Ms. Stroup's "current Performance record [would] be subject to review" at her hearing on the Letter's charges. *Id.*

Mr. Lee's Letter of Charge was identical to Ms. Stroup's as to the foregoing matters. Mr. Lee's Letter further stated that he was "observed smoking an electronic cigarette" in violation of United's policies and federal regulations. *Id.* at 1185. The Letter leveled three more accusations against Mr. Lee: (1) he "failed to follow company policy when [he] stood sideways in the aisle during the automated safety demonstration" and "left [his] assigned demo position prior to the completion of the safety demonstration"; (2) he "failed to follow company policy . . . when [he] took a vodka bottle from first class and gave it to a customer . . . without charging [him]"; and (3) he "failed to follow service guidelines when [he] gave out full unopened beverage cans without following the United Economy beverage service guidelines during the beverage service and again when [he] did a water service with a bottle of water with glasses []stacked on one another instead of using a pickup pan." *Id.* at 1185–86.

The Letters of Charge never expressly mentioned any safety-related violations or Plaintiffs' alleged dishonesty.

United held disciplinary proceedings about a month after the Letters of Charge were issued. Plaintiffs submitted written and oral statements, participating in the proceedings with the assistance of Mr. Kyle, who was acting in his capacity as their union representative. Mr. Dodge presented the evidence at these proceedings that he had compiled. Mr. Whittaker served as the hearing officer. After the proceedings, Mr. Whittaker, apparently, "did not find either Plaintiff credible at the hearings, based on their own admissions of dishonesty; their inconsistent and evasive statements; and discrepancies between their statements, [and the] objective evidence[,] . . . and information received from persons who had no motive to be untruthful [like United employees and investigators]." Aplt.'s Opening Br. at 20 (citing Aplt.'s App., Vol. XV, at 3593–97, 3607 (Tr. Dean Whittaker Test., dated Mar. 2, 2018)). In short, Mr. Whittaker decided to terminate Plaintiffs' employment "in 'large part' because he 'didn't find them trustworthy.'" *Id.* (quoting Aplt.'s App., Vol. XV, at 3606–07).[5] Mr. Whittaker

---

[5]     *See also* Aplt.'s App., Vol. XV, at 3606–07 (asked by United's counsel, "So the ultimate question, Mr. Whittaker, is: Why aren't the Plaintiffs working at United anymore?" Mr. Whittaker responded, "[B]ased on what took place on that aircraft, based on the investigation and based on the facts, um, I believe it was just to discharge them from United, And, you know, a *large part* of that reason is *I didn't find them trustworthy.* There was [sic] conflicting statements throughout, and, um, again, I was very concerned what took place on that aircraft and, um, for many factors. I—there was [sic] just so many things

(continued...)

advised Mr. Kyle of his decision, and based on Mr. Kyle's request, agreed that Plaintiffs could instead retire. Plaintiffs retired effective November 18, 2013, around three months after Ms. Simms filed her complaint. When their employment with United ended, Ms. Stroup was 55 years old, and Mr. Lee was 61 years old. They served 29 and 41 years as flight attendants, respectively.

After these events, Plaintiffs filed suit against United, alleging they were terminated from their jobs because of their age. Plaintiffs' claims were heard over a five-day trial. At trial, in its defense, United focused heavily on several matters: Plaintiffs' lack of direct evidence of age discrimination; Plaintiffs' failure to complain of that type of discrimination prior to termination; and Plaintiffs' admission of policy violations and dishonesty during the disciplinary process. Distilled to its essence, United's argument was that Plaintiffs' evidence failed to establish they had been terminated because of their ages.

For their part, Plaintiffs broadly sought to convince the jury that United's proffered, nondiscriminatory rationales for their termination were pretextual and unworthy of credence. They did so by showing alleged inconsistencies in United's explanations, attacking the credibility of United's witnesses, and pointing out purported procedural irregularities. Relatedly, Plaintiffs also emphasized the

---

[5](...continued)
there, um, that occurred that were so concerning . . . . And so, again, it was just very concerning to me, entirely what occurred on that aircraft. *And then, again, the fact that I just didn't find them trustworthy as this unfolded and what took place.*" (emphases added)).

alleged disconnect between the reasons justifying Plaintiffs'
terminations—supposedly concerns about Plaintiffs' honesty and the safety-related
implications of Plaintiffs' policy violations—and the reasons expressed in
Plaintiffs' Letters of Charge, which noted neither safety-related nor
dishonesty-related concerns.

Plaintiffs did not contest the violations they committed but minimized them
as "commonplace" or "minor." *See* Aplees.' Resp. Br. at 9–19. In fact, some of
the testimony from United's employees actually helped Plaintiffs' case. For
instance, Mr. Bagwe, when questioned by Plaintiffs' counsel, testified that United
instructed him to observe Plaintiffs, *but not* the other flight attendants working
with Plaintiffs during the flight. This was the only flight out of 50 flights in which
Mr. Bagwe had acted as an observer during his career where he had been tasked to
specifically monitor—or, "target," as Plaintiffs characterize it—only specific flight
attendants, and not the whole flight crew.

In addition, certain trial testimony also suggested United's de facto practice
was to mete out progressive, or gradually escalating, discipline; yet, such a
practice was not followed in Plaintiffs' cases—a failure that arguably implied
entirely subjective disciplinary decision-making. Plaintiffs also proffered some of
their own testimony about the emotional distress their discharge
caused—particularly as it related to Plaintiffs' constructive discharge theory—with
the district court allowing that testimony over United's request to exclude it.

9

The jury found for Plaintiffs on their age discrimination and willfulness claims, awarding corresponding damages. In particular, it found the choice that Mr. Whittaker effectively offered Plaintiffs—i.e., retiring or firing—constituted a constructive discharge, and United does not challenge that finding on appeal.[6] The district court entered its final judgment and later denied United's JMOL motion and motion for a new trial.

In denying the JMOL motion, the district court acknowledged at the outset that "United is correct that there was no direct evidence of age discrimination"; that is, "there was no evidence that any United employee considered Plaintiffs' ages in connection with the termination decision" and "Plaintiffs testified that they never heard an age-related comment or remark by anyone at United, and admitted to having no prior interactions and no knowledge of age-related comments or bias by the United employees who were involved in the hearings and charges against them." Aplt.'s App., Vol. V, at 1138 (Dist. Ct. Order on Post-Trial Mots., filed Sept. 4, 2019).

All the same, the district court rejected United's argument that no legally sufficient evidentiary basis existed for the jury's decision. The district court noted that "[w]hile the evidence of pretext did not *compel* a finding of discriminatory motive, . . . there was sufficient evidence for the jury to find that United

---

[6]    *See* Aplees.' Resp. Br. at 20 (noting that "[b]ecause Plaintiffs had no choice but to retire, the jury found that Defendant had constructively discharged them, which Defendant does not challenge on appeal").

intentionally discriminated against Plaintiffs." *Id.* at 1152. Likewise, though United offered explanations for its adverse actions, the jury did not have to credit or believe them. *Id.* at 1152–53. And "[t]he trial largely was about whether United's explanation for firing Plaintiffs was credible," reasoned the court. *Id.* at 1153. Thus, the court denied United's JMOL motion as to whether United discriminated against Plaintiffs because of their ages. *Id.*

The district court then rejected United's JMOL argument that the jury improperly found that United willfully violated the ADEA. At bottom, the district court noted that the evidence, particularly when evaluated in the context of the legal standard for JMOL motions, was "sufficient to demonstrate both pretext and knowledge by United's decision[-]maker," Mr. Whittaker, that "age discrimination [was] prohibited." *Id.* at 1155. As to the latter, United itself "presented evidence of its anti-discrimination policies regarding age, and that its managers [were] trained concerning the company's anti-discrimination policies." *Id.* at 1155–56 (citing Aplt.'s App., Vol. XIV, at 3271–72 (Tr. Deepesh Bagwe Test., dated Mar. 1, 2018); *id.* at 3433 (Tr. Mark Dodge Test., dated Mar. 1, 2018); *id.* Vol. XV, at 3604–06). Based on this evidence from United, along with Plaintiffs' pretext evidence, the jury reasonably could have inferred, said the court, that "United employees were indifferent to the ADEA and its requirements in connection with their investigation and termination of Plaintiffs." *Id.* at 1156. Accordingly, the

11

district court denied United's JMOL motion as to whether United willfully violated the ADEA.

Lastly, the district court rejected United's Rule 59 motion for new trial. The court found "the admission of [Plaintiffs'] testimony regarding emotional distress did not affect a substantial right of United, and thus does not require a new trial." *Id.* at 1167. Contrary to United's "contention that admission of emotional distress testimony is, by definition, prejudicial and inflammatory," the district court found that the testimony here "was minimal over the context of the five-day trial, and, more importantly, provided support for Plaintiffs' constructive discharge claim." *Id.*

The court reasoned that "even if there was error in admitting" Plaintiffs' emotional distress testimony, "the evidence was not so prejudicial or inflammatory as to cast doubt on the reliability of the jury's other findings." *Id.* at 1170. And "[a]ny prejudice that [the testimony] may have caused United was mitigated by Jury Instruction No. 20," which explicitly stated that any emotional distress Plaintiffs may have suffered was irrelevant as to whether United violated the ADEA. *Id.*; *see also id.* at 1166 (noting that Jury Instruction No. 20 also made clear that no damages should be awarded for emotional pain or suffering, as such damages were not recoverable under the ADEA). Consequently, as the court reasoned, because United "provided no basis from which . . . [to] conclude that the emotional distress evidence had a substantial effect on the outcome [of the trial] or

12

that a contrary result would have occurred if such evidence had been excluded,"
United was not entitled to a new trial. *Id.* at 1170. And United filed this timely
appeal.

## II

United argues on appeal that (1) the district court erred in denying its JMOL
motion because (a) there was insufficient evidence to support the jury's finding
that United discriminated against Plaintiffs because of their ages in violation of
the ADEA, and (b) similarly, there was insufficient evidence to support the jury's
finding that United acted willfully in committing any ADEA violation; and (2) the
court abused its discretion and committed reversible error when it admitted
Plaintiffs' allegedly irrelevant and highly prejudicial emotional distress testimony.
We conclude that United's arguments are unavailing.

## A

"We review a district court's denial of a [JMOL] motion de novo, applying
the same standards as the district court." *Bill Barrett Corp. v. YMC Royalty Co.,
LP*, 918 F.3d 760, 766 (10th Cir. 2019) (per curiam) (quoting *Home Loan Inv. Co.
v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1261 (10th Cir. 2016)). In our review
"we consider the record in its entirety and 'draw all reasonable inferences in favor
of the nonmoving party.'" *Miller v. Eby Realty Grp. LLC ("Eby Realty")*, 396
F.3d 1105, 1110 (10th Cir. 2005) (quoting *Reeves v. Sanderson Plumbing Prods.,
Inc.*, 530 U.S. 133, 150 (2000)). "We do not however 'weigh the evidence, pass

13

on the credibility of witnesses, or substitute [our] conclusions for that of the jury.'" *Id.* at 1110–11 (alteration in original) (quoting *Minshall v. McGraw Hill Broad. Co., Inc.*, 323 F.3d 1273, 1279 (10th Cir. 2003)).  In other words, "it is the sole province of the jury to appraise credibility, draw inferences, determine the weight to be given testimony and to resolve conflicts in the facts."  *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1468 (10th Cir. 1992) (quoting *Dugan v. EMS Helicopters, Inc.*, 915 F.2d 1428, 1430 (10th Cir. 1990)).

"Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position."  *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013) (quoting *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1156 (10th Cir. 2006)).  In other words, "[a] district court's refusal to grant judgment as a matter of law may be reversed only if the evidence is such that without weighing the credibility of the witnesses the only reasonable conclusion is in [the moving party]'s favor."  *Id.* at 1216 (second alteration in original) (quoting *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1214–15 (10th Cir. 2008)).  However, "[t]he question is not whether there is literally no evidence supporting the [nonmoving] party . . . but whether there is evidence upon which the jury could properly find [for that party]."  *Century 21 Real Est. Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1278 (10th Cir. 2003) (alterations and omission in original) (quoting *Hurd v. Am. Hoist & Derrick Co.*, 734 F.2d 495, 499 (10th Cir. 1984)).

14

The quantum of evidence necessary to defeat a JMOL motion is slight, such that justifying the grant of a JMOL motion is difficult in practice. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986) ("[B]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872))). We have stated that "[i]n reviewing the denial of a Rule 50 motion, we determine only whether the jury verdict is supported by substantial evidence when the record is viewed most favorably to the prevailing party." *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1128 (10th Cir. 2002). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if different conclusions also might be supported by the evidence." *Id.* (quoting *Beck v. N. Nat. Gas Co.*, 170 F.3d 1018, 1022 (10th Cir. 1999)).

"Thus, the mere existence of contrary evidence does not itself undermine the jury's findings as long as sufficient other evidence supports the findings." *Id.* (quoting *Thunder Basin Coal Co. v. Sw. Pub. Serv. Co.*, 104 F.3d 1205, 1213 (10th Cir. 1997)). And, it is worth underscoring an earlier point: "We do not retry issues, second guess the jury's decision-making, or assess the credibility of witnesses and determine the weight to be given their testimony," as "[i]t is the

15

province of the jury, and not this court, to resolve conflicts in the evidence." *Id.* (citing *Thunder Basin*, 104 F.3d at 1213).

Furthermore, we also have spoken of a general reticence to grant JMOL motions, either in the first instance or on appeal. *See, e.g.*, *Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1130 (10th Cir. 2019) ("Judgment as a matter of law is cautiously and sparingly granted and then only when the court is certain the evidence *conclusively* favors one party such that reasonable [people] could not arrive at a contrary verdict." (alteration in original) (emphasis added) (quoting *Bill Barrett*, 918 F.3d at 766)); *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 560 (10th Cir. 1996) ("[W]e must be mindful that a ruling which deprives a party of a determination of the facts by a jury 'should be cautiously and sparingly granted.'" (quoting *Cockrell v. Boise Cascade Corp.*, 781 F.2d 173, 177 (10th Cir. 1986))).[7]

---

[7]     It bears mentioning that our deferential posture matches the approach of our sister circuits. *See, e.g.*, *Rinsky v. Cushman & Wakefield, Inc.*, 918 F.3d 8, 26 (1st Cir. 2019) (noting that review of the district court's denial of a JMOL motion "*is weighted toward preservation of the jury verdict*, which stands unless the evidence was so strongly and overwhelmingly inconsistent with the verdict that no reasonable jury could have returned it" (emphasis added) (quoting *Crowe v. Bolduc*, 334 F.3d 124, 134 (1st Cir. 2003))); *Washington v. Denney*, 900 F.3d 549, 558 (8th Cir. 2018) (noting that the "law places a *high standard on overturning a jury verdict* because of the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused," and that the legal standard for considering JMOL motions reflects a "hesitan[ce] 'to interfere with a jury verdict'" (emphasis added) (quoting *Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 805 (8th Cir. 2017))); *Merritt Hawkins & Assocs., L.L.C. v. Gresham*, 861 F.3d 143, 150 (5th Cir. 2017) ("[O]ur review [of a district court's denial of a

(continued...)

16

In sum, overall, our caselaw contemplates that we apply a light touch in reviewing denials of JMOL motions.  We do not weigh evidence and we do not assess credibility.  We affirm denials so long as there was sufficient evidence—viewing the evidence in the light most favorable to the non-moving parties (here, Plaintiffs)—for the jury to reasonably find as it did.

**1**

United argues the district court erred in denying its JMOL motion in part because Plaintiffs failed to "adduce[] sufficient evidence to warrant a jury's determination that [United took] adverse employment action . . . against [them] on the basis of age."  Aplt.'s Opening Br. at 31 (quoting *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 744 (10th Cir. 1991)).  United claims Plaintiffs' "testimony was insufficient to avoid JMOL" because it "offered 'mere conjecture' about United's purportedly ageist motives."  *Id.* at 34.  According to United, Plaintiffs admitted they had "no direct evidence of age discrimination by United."  *Id.* at 34–35.  Instead, they cited their confusion or "feeling[s]" as support for their eventual

---

[7](...continued)
JMOL motion] is *highly deferential* to the jury's verdict." (emphasis added)); *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1226 (11th Cir. 2012) ("Th[e] standard [of review for a district court's denial of a JMOL motion] is *heavily weighted in favor of preserving the jury's verdict*." (emphasis added)); *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004) ("Our job at this stage is not to determine whether the jury believed the right people, but only to assure that it was presented with a legally sufficient basis to support the verdict.").

conclusions that United terminated their employment because of their respective ages. *Id.*

Further, United reasons that Plaintiffs' admission to violating "United policies and repeatedly l[ying] during the investigation and hearing process" compromised whatever probative value their speculation may have had. *See id.* at 35. United further alleges that "[o]verwhelming evidence" demonstrated United exercised its business judgment in good faith when it terminated Plaintiffs. *Id.* (bolding omitted). Invoking the so-called business judgment rule, United argues that our caselaw makes clear we should "not second guess business decisions made by employers, in the absence of some evidence of impermissible motives." *Id.* at 36 (quoting *Lucas v. Dover*, 857 F.2d 1397, 1403–04 (10th Cir. 1988)).[8] Moreover, United claims that "[t]he jury and the district court rewarded [the] Plaintiffs' distraction, relativism, and derision" by questioning and rejecting United's exercise of business judgment despite the "[d]earth of evidence of pretext." *Id.* at 40 (bolding omitted). In particular, United accuses the district court of "emphasiz[ing] irrelevant evidence, misstat[ing] evidence, present[ing]

---

[8]     *See Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) ("As courts are not free to second-guess an employer's business judgment, this assertion [by a plaintiff that 'she was *in fact* equally or more qualified than' another employee, despite her manager's contrary belief] is insufficient to support a finding of pretext."); *see also Sanchez v. Philip Morris, Inc.*, 992 F.2d 244, 247 (10th Cir. 1993) (defining the boundaries of the rule and collecting cases).

evidence so out of context as to render it misleading, and misappl[ying] the relevant legal standards" in its pretext discussion. *Id.* at 41. United claims it "followed the [collective bargaining agreement] and its internal procedures and conducted appropriate investigations and fair and thorough hearings." *Id.* at 44. As well, United challenges the district court's view that the jury reasonably could have determined that United's witnesses were not credible. *Id.* at 44–45.

In sum, United alleges "there was no evidence, only Plaintiffs' speculation, that their age 'actually played a role [in United's decision-making] process and had a determinative influence on [their discharges].'" *Id.* at 45–46 (alterations in original) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

On the other hand, Plaintiffs argue that they "established a legally sufficient evidentiary basis for the jury to find that [United] fired [them] because of their ages." Aplees.' Resp. Br. at 31. Reminding us that "[e]vidence of pretext alone is sufficient to show age discrimination," *id.* at 32, Plaintiffs maintain that the jury could permissibly infer from the evidence—which consisted *mostly of testimony*—that United's witnesses were not credible and its true motivation for discharging Plaintiffs was their age. More specifically, Plaintiffs contend that the mainly testimonial nature of the evidence is particularly significant, as the jury's inferences regarding age discrimination and, in particular, pretext were likely intertwined with its credibility assessments—assessments that we may not question on appeal. *See id.* at 33–34.

19

Plaintiffs also contend the evidence amply supported an inference of discriminatory intent. *Id.* at 34–39. Plaintiffs presented evidence showing (1) their policy violations were commonplace amongst United's flight attendants and did not warrant termination; (2) United did not follow its express policies and procedures nor its de facto policy of progressive discipline in deciding to terminate Plaintiffs; and (3) United offered conflicting rationales for why it discharged Plaintiffs. *Id.* at 34–38. From this evidence, Plaintiffs argued that a reasonable jury could infer that United's proffered, nondiscriminatory rationales for its adverse employment action were pretextual and the true basis for its decision was unlawful age discrimination. *Id.* at 34–39.

Moreover, Plaintiffs reject the notion that United is substantially protected from liability by the business judgment rule. *Id.* at 39–41. As Plaintiffs see it, United invokes the business judgment rule in an improper effort to evade the antecedent question of whether its nondiscriminatory explanation for terminating Plaintiffs is pretextual—that is, whether United truly was exercising legitimate business judgment or, instead, invoking such judgment as a cover for a prohibited motive. *See id.* at 40. To sum up, Plaintiffs exclaim that, "'[w]hen viewed in the aggregate, [their] . . . evidence [was] sufficient to raise a genuine doubt about [United's] motivation,' and [thus] judgment as a matter of law on Plaintiffs' ADEA claims [would have been] improper." *Id.* at 45 (first and third alterations

and omission in original) (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1220 (10th Cir. 2002)).

We are persuaded by Plaintiffs' arguments. There was sufficient evidence for the jury to reasonably find that United discriminated against Plaintiffs because of their age. As outlined above, the outcome of the trial hinged on the pretext issue—whether United's proffered, nondiscriminatory reasons for discharging Plaintiffs were, in fact, the true basis for its action.

"Pretext exists when an employer does not honestly represent its reasons for terminating an employee." *Eby Realty*, 396 F.3d at 1111. Plaintiffs did not need to provide the jury with direct evidence of United's purported discriminatory acts or intentions; circumstantial evidence pointing toward pretext may suffice. *See Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."); *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007) ("An employee may show pretext based on 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief." (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997))). A "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer

unlawfully discriminated." *Reeves*, 530 U.S. at 148; *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."); *accord Eby Realty*, 396 F.3d at 1111.[9]

Indeed, "[p]retext can be demonstrated by a combination of the plaintiff's prima facie case and evidence exposing the employer's articulated reason as either incredible *or* less likely the actual motivation." 1 Andrew J. Ruzicho, et al., LITIGATING AGE DISCRIMINATION CASES § 2:27, Westlaw (database updated Dec. 2021) (emphasis added); *see Corneveaux v. CUNA Mut. Ins. Grp.*, 76 F.3d 1498, 1504 (10th Cir. 1996) ("In an age discrimination case plaintiffs 'need not disprove defendant's reasons or demonstrate that age was the only factor motivating the decision, but they "must show that age actually played a role in the [employer's] decision making process and had a determinative influence" on the decision.'" (alteration in original) (quoting *Jones v. Unisys Corp.*, 54 F.3d 624, 632 (10th Cir.1995))); *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 82 (2d Cir. 1983) ("[The plaintiff] [i]s not required to show that the reasons offered were false, but that they

---

[9]    "To prove a prima facie case of age discrimination, a plaintiff must show: '1) she is a member of the class protected by the [ADEA]; 2) she suffered an adverse employment action; 3) she was qualified for the position at issue; and 4) she was treated less favorably than others not in the protected class.'" *Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1279 (10th Cir. 2010) (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998)).

were not [the employer's] only reasons and that age made a difference. . . . [T]he jury was entitled to conclude that [the employer's] dissatisfaction, even if genuine, was a pretext in the sense that it purported to be a *complete* explanation and was not, for age was a causal factor as well.").

Unless the evidence is "lopsided" in the defendant's favor, ordinarily "the jury's handling of pretext evidence will be dispositive." 1 Ruzicho, *supra*, § 2:27; *see Whittington v. Nordam Grp. Inc.*, 429 F.3d 986, 994 (10th Cir. 2005) ("The jury could infer that [the employer's] explanation at trial for [the plaintiff's] termination . . . was an after-the-fact rationalization for what had been age discrimination. The evidence is sufficient to support the verdict of discrimination reached by the jury. It certainly cannot be said that the evidence 'points but one way.'" (quoting *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 549 (10th Cir. 1999))); *see also Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000) ("Although defendants contested [the plaintiff's] case, their evidence is not of such magnitude that a reasonable jury could only find in their favor (i.e., that their justification for terminating [the plaintiff] was not pretextual). All defendants have demonstrated is that they disputed [the plaintiff's] characterization of the events and put forth evidence to support their position. The record reveals that [the plaintiff] countered defendants' arguments and created conflicts in substantial evidence. The jury had both conflicting versions before it and apparently did not find credible defendants' explanation . . . . The jury, with

23

its ability to listen to live testimony, was in a better position to judge the credibility of the witnesses and the accounts of the events; as such, we will not second guess their rejection of defendants' proffered justification." (citations omitted)).

In establishing pretext, Plaintiffs were largely successful in undermining the credibility of United's witnesses—casting doubt on the legitimacy of United's explanations for its conduct.  On appeal, United is basically asking us to make credibility determinations as to the proffered testimony that the jury already has reviewed and weighed.  Although we surely review a district court's disposition of a JMOL motion de novo, we may not go that far.

More specifically, in the trial, United chose to present testimony and other evidence in an attempt to persuade the jury that Plaintiffs' policy violations and dishonesty during the disciplinary process were to blame for their discharge.  Not to be outdone, Plaintiffs similarly tried to convince the jury that United's reasons were pretextual bases for the real cause of their discharge: their age.  They did so by attacking United's inconsistent explanations, the credibility of its witnesses, and procedural irregularities in United's investigation and subsequent disciplinary proceedings.  In particular, concerning the irregularities, recall that the trial evidence—testimonial and otherwise—indicated that Plaintiffs' policy violations were commonplace or minor, such that, as the district court opined, the "jury could have found that the violations . . . were not so severe as to warrant termination."

24

Aplt.'s App., Vol. V, at 1148.  Further, they heard testimony from Mr. Bagwe about the unusual nature of his in-flight investigation—which was intentionally focused on unearthing wrongdoing by Plaintiffs and only Plaintiffs.[10] Furthermore, Plaintiffs underscored the alleged disconnect in United's reasons for disciplining them.  Critically, the jury heard from Mr. Whittaker whose testimony showed a disconnect between the stated grounds for instituting disciplinary proceedings against Plaintiffs, expressed in their Letters of Charge, and the bases that United later offered for disciplining Plaintiffs—i.e., safety-related and dishonesty-related concerns.  Based on this disconnect, the jury reasonably could have determined that Mr. Whittaker was not credible.  And, more specifically, it reasonably could have inferred that United's reasons for disciplining Plaintiffs were a pretext for age discrimination—that is, United was fabricating different and arguably more grave reasons to justify disciplining them, in order to cover up the but-for cause for its adverse action: Plaintiffs' age.  *See Hagelthorn*, 710 F.2d at 82.

---

[10]    To be clear, we recognize that an employer may focus its investigation on one employee or group of employees, where the employee or group is the specific subject of a complaint of wrongdoing, without such conduct necessarily constituting evidence of pretext.  Here, however, the evidence suggested that Mr. Bagwe's in-flight investigation differed markedly from United's past routine procedure regarding such investigations.  If, for example, United's standard practice was to focus only on employees who had been accused of wrongdoing, Mr. Bagwe's exclusive focus on Plaintiffs would have been of no moment on the issue of pretext.

When this evidence is considered, along with all of the other evidence before the jury, and construed in the light most favorable to Plaintiffs, we conclude that there was substantial evidence to support the jury's verdict. More specifically, there was sufficient evidence for the jury to reasonably determine that United's stated reasons for disciplining Plaintiffs were a pretext for unlawful age discrimination. In this regard, United's reliance on the business judgment rule is of no moment. As the district court itself succinctly explained, "[t]he business judgment rule does not immunize an employer where its proffered reasons have been shown to be unworthy of belief." Aplt.'s App., Vol. V, at 1140 (citing *Beaird v. Seagate Tech.*, 145 F.3d 1159, 1169 (10th Cir. 1998)). Here, the jury effectively found that United's reasons for constructively discharging Plaintiffs were pretextual. As a result, the business judgment rule does not protect United from Plaintiffs' age discrimination claim.

Though United effectively asks us to do so, we are not permitted to consider and weigh the evidence anew, once the jury—as the trier of fact—has spoken. That is, we cannot grant United an "evidentiary do-over." The record, viewed in a light most favorable to Plaintiffs, is enough to support the jury's determination that United terminated Plaintiffs' employment because of their ages. Thus, the district court properly denied United's motion for JMOL on the question of whether United committed age discrimination in violation of the ADEA.

**2**

We turn to United's second claim.  Specifically, United argues that the district court erred in denying United's JMOL motion on the question of whether any ADEA violation that they may have committed was willful.  In its view, there was no evidence from which the jury could reasonably infer that United willfully violated the ADEA.  In undertaking our consideration of this claim, we recall that our JMOL standard of review is deferential.  *See supra* Part II.A.  Among other things, we make all reasonable inferences from the record in favor of the nonmoving party (here, Plaintiffs), and do not weigh the evidence or make our own judgments regarding witnesses' credibility.  *See, e.g.*, *Eby Realty*, 396 F.3d at 1110; *Kenworthy*, 979 F.2d at 1468.

"A plaintiff may be awarded liquidated damages under the ADEA if the defendant's violation was 'willful.'"  *Minshall*, 323 F.3d at 1282 (quoting 29 U.S.C. § 626(b)).  The Supreme Court initially gave content to that term under the ADEA in a case involving a formal, publicized employer policy, which it held, on its face, "discriminates against protected individuals on the basis of age, and thereby violates the Act."  *Trans World Airlines, Inc. v. Thurston ("Thurston")*, 469 U.S. 111, 124 (1985).  *Thurston* held that "a violation of the [ADEA] was 'willful' if 'the employer . . . knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.'"  *Id.* at 126 (quoting *Air Line Pilots Ass'n Intern. v. Trans World Airlines, Inc.*, 713 F.2d 940, 956 (2d Cir. 1983) (omission in original), *overruled on other grounds*, *Thurston*, 426 U.S. at

27

125–30)).  The Court observed that "the legislative history and the structure of the statute show that Congress intended a two-tiered liability scheme": that is, there first must be a liability determination for the ADEA violation itself, and, then, second and distinctly, there must be a determination that the ADEA violation was committed willfully, which permits an award of liquidated damages.  *Id.* at 128.  Notably, the Court reasoned that the ADEA should not be applied "in a manner that frustrates this intent."  *Id.* at 128.

However, in revisiting this topic eight years later, the Court observed that the circuit courts exhibited a "misplaced" "concern . . . that the application of *Thurston* would defeat the two-tiered system of liability intended by Congress."  *Hazen Paper*, 507 U.S. at 615–16.  As an apparent product of this off-base concern, "[a] number of Circuits have declined to apply *Thurston* to what might be called an informal disparate treatment case—where age has entered into the employment decision on an ad hoc, informal basis rather than through a formal policy"—and had formulated various proof hurdles that plaintiffs had to overcome to establish a "willful violation."  *Id.* at 615–16.

In *Hazen Paper*, the Court elected to "reaffirm that the *Thurston* definition of 'willful' . . . applies to all disparate treatment cases under the ADEA," including where "[a]ge entered into the employment decision . . . as an undisclosed factor motivating the employer on an ad hoc basis."  *Id.* at 617.  And it went further, reinforcing that—if a "willful" violation is otherwise established

28

under this definition—the employee need not overcome other proof hurdles that the lower courts had previously erected; notably, "the employee need not additionally demonstrate that the employer's conduct was outrageous, or provide direct evidence of the employer's motivation, or prove that age was the predominant, rather than a determinative, factor in the employment decision." *Id.*; *see Brown v. Stites Concrete, Inc.*, 994 F.2d 553, 560 (8th Cir. 1993) (en banc) ("[T]he Supreme Court has clarified that the concern for ensuring a two-tiered liability scheme is 'misplaced' and that the focus should strictly be on whether the employer's actions were in willful violation of the ADEA as provided in the statute.").

The inquiry into whether there was sufficient evidence for the jury to reasonably find willfulness is "fact-sensitive and individualistic." *Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013); *accord* 2 Howard C. Eglit, AGE DISCRIMINATION § 8.73 (2d ed.), Westlaw (database updated Oct. 2021) ("The question of willfulness is fact-sensitive and individualistic."). And, in the wake of *Hazen Paper*—which rejected the necessity for direct or otherwise elevated levels of proof to establish willfulness—the courts have recognized that a plaintiff may use the same evidence in addressing the admittedly distinct inquiries into whether the employer violated the ADEA in the first place, and, if so, whether the employer committed a "willful" violation. *See, e.g.*, 1 Ruzicho, et al., *supra*, § 5:6

29

("The same evidence may be used to prove the underlying violation and willfulness.").

As the Ninth Circuit has soundly reasoned,

> We think that allowing plaintiffs to make a showing of willfulness using the same evidence that was used to establish the underlying ADEA violation will not eliminate the vitality of the two-tiered scheme, as the evidence in question would be put toward two different ends. The first point of inquiry would be whether or not the evidence at issue served to prove that the challenged action was taken for impermissible, age-related reasons, while the second would look to whether that evidence demonstrated that "the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA."

*EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 682 (9th Cir. 1997) (quoting *Hazen Paper*, 507 U.S. at 614).[11]   And the en banc Eighth Circuit has made a related point: "The question is not whether the evidence used to establish willfulness is different from and additional to the evidence used to establish a violation of the ADEA, but whether the evidence—additional or otherwise—satisfies the distinct standard used for establishing willfulness." *Brown*, 994 F.2d at 560; *accord* 1 Ruzicho, et al., *supra*, § 5:6.

Accordingly, following *Hazen Paper*, it is clear that a plaintiff may rely on circumstantial evidence to establish a willful violation. *See Pape Lift*, 115 F.3d at

---

[11]     This reasoning is compatible with our observation in *Eby Realty* that the "evidentiary showing is distinct" for establishing ADEA liability and a "willful" ADEA violation, 396 F.3d at 1115, because, even where the universe of evidence is the same, a plaintiff typically must marshal or frame the evidence differently to address the two distinct inquiries—i.e., liability and willfulness.

30

681 ("The factors that the Court identified as relevant to an analysis of willfulness in *Hazen Paper* and *Thurston* support the use of circumstantial evidence. . . . Because the willful/nonwillful distinction rests on whether the action was undertaken in good faith, circumstantial evidence clearly is relevant to the jury's determination."); *Brown*, 994 F.2d at 560–61 (underscoring that "neither direct evidence nor additional evidence is required to establish willfulness").

Furthermore, as particularly relevant here, we and other courts have reasoned that "[a] jury [is] . . . entitled to infer from [an employer's] pretextual explanations for its actions that it *knew* its conduct was unlawful"—and, thus, find the employer acted willfully. *Dodoo v. Seagate Tech., Inc.*, 235 F.3d 522, 532 (10th Cir. 2000) (emphasis added); *see Cross v. New York City Transit Auth.*, 417 F.3d 241, 253 (2d Cir. 2005) ("[T]he evidence was sufficient to support a jury finding that the defendants recklessly disregarded federal law prohibiting age discrimination. . . . The creation of a calculated subterfuge to support an adverse employment action supports an inference that the employer knew or recklessly ignored the fact that their real reason for demoting the plaintiffs—age—was unlawful."); *Pape Lift*, 115 F.3d at 680 ("[The employer's agents] appear to have made attempts to conceal evidence of any wrongdoing by offering pretextual reasons for the termination. Not only did they put forward two different sets of reasons for [the employee's] termination, but the EEOC presented evidence that

31

called into question the veracity of both explanations. The jury was entitled to credit the EEOC's evidence, which supported a conclusion that the discrepant (and perhaps, incredible) responses proffered by [the employer's agents] were unsuccessful attempts to mask a statutory violation.  Indeed, this apparent subterfuge certainly suggests that both [agents] were aware of [the employer's] potential liability for [the employee's] termination."); *see also* 1 Ruzicho, *supra*, § 5:6 ("Proof of unconscious motivation, based for example on . . . a pretext may camouflage a deliberate, discriminatory purpose. . . .  Thus, an employer's use of pretext for discrimination may well make out a persuasive claim of willfulness." (footnotes omitted)); *cf. Hazen Paper*, 507 U.S. at 617 (noting, in the context of holding that "the *Thurston* definition of 'willful' . . . applies to all disparate treatment cases," including those where age operates "as an undisclosed factor motivating the employer on an ad hoc basis," that "surely an employer's reluctance to acknowledge its reliance on the forbidden factor should not cut *against* imposing a penalty" for a willful violation).

On appeal, United argues that, even if the jury's finding of age discrimination must stand, Plaintiffs' evidence did not support the jury finding that United willfully violated the ADEA.  United questions the district court's analysis, which considered whether "'the combination of the jury's rejection of the employer's explanations as pretextual and the supervisor's awareness that the ADEA prohibited age discrimination' was sufficient to prove willfulness."

32

Aplt.'s Opening Br. at 48 (quoting Aplt.'s App., Vol. V, at 1154–55).  It points out that the district court held Plaintiffs' evidence met the willfulness standard "based on (1) its earlier pretext ruling and (2) evidence that 'Mr. Whittaker and those involved in the investigation regarding Plaintiffs knew that age discrimination was prohibited, because United presented evidence of its anti-discrimination policies regarding age, and that its managers are trained concerning the company's anti-discrimination policies.'"  *Id.* (quoting Aplt.'s App., Vol. V, at 1155–56).

United contends this ruling was legally erroneous because it improperly conflated Plaintiffs' pretext showing with the showing necessary to establish willfulness.  In particular, United alleges that it was not enough that Plaintiffs established that United was aware of the ADEA in the abstract or was even negligent in following it.  Instead, according to United, "to establish willfulness, the evidence must permit the inference that an employer knew or recklessly disregarded that the ADEA prohibited *the specific conduct* in which the employer engaged, in other words, 'whether *its conduct* was prohibited by the statute.'"  *Id.* at 49 (quoting *Hazen Paper*, 507 U.S. at 617).  United argues Plaintiffs failed to make this showing, and that their pretext evidence alone may not establish a willful violation on United's part.  United therefore maintains that "no reasonable jury could have found that [it] willfully violated the ADEA."  *Id.* at 52.

33

Responding, Plaintiffs argue that "there is no requirement that Plaintiffs use different evidence than that [evidence] supporting the jury's finding of liability to establish willfulness." Aplees.' Resp. Br. at 46. Rather, as Plaintiffs reason, their evidence of pretext, and evidence establishing that "United had an anti-discrimination policy on which its managers, including Mr. Whittaker, were trained," constituted substantial evidence supporting the jury's willfulness finding. *Id.* at 47 (citing Aplt.'s App., Vol. XV, at 3604–06). In particular, United's decision to "'proffer[] false reasons [for Plaintiffs' termination] in an attempt to deny the existence' of age discrimination, 'provide[d] an ample basis to support the jury's finding that [United] willfully violated the ADEA.'" *Id.* at 47–48 (quoting *Burlew v. Eaton Corp.*, 728 F. Supp. 529, 534 (E.D. Wis. 1989)). Put differently, Plaintiffs contend that "[t]he jury was 'entitled to infer from [Defendant's] pretextual explanations for its actions that it *knew* its conduct was unlawful,' because otherwise, it would not have attempted to provide false reasons for its actions." *Id.* at 48 (second alteration in original) (quoting *Dodoo*, 235 F.3d at 532). Thus, because the jury could reasonably infer that United willfully violated the ADEA, Plaintiffs conclude that United was not entitled to judgment as a matter of law as to the jury's willfulness determination.

Guided by the legal principles outlined *supra*—and, more specifically, applying the light touch in our review of the court's JMOL denial that our caselaw directs—we conclude that Plaintiffs have the better of this dispute. A

34

plaintiff may rely on the same universe of evidence to both establish ADEA liability and to satisfy the willfulness standard. *See, e.g.*, *Pape Lift*, 115 F.3d at 682; 1 Ruzicho et al., *supra*, § 5:6. And, significantly, an employer's "creation of a calculated subterfuge to support an adverse employment action supports an inference that the employer knew or recklessly ignored the fact that their real reason for [the adverse action against] the plaintiffs—age—was unlawful." *Cross*, 417 F.3d at 253; *see Dodoo*, 235 F.3d at 532.

Here, as the district court reasoned, the jury reasonably could have inferred from the solid evidence of pretext supporting its finding of ADEA liability, along with the evidence that United agents were aware of the prohibition against age discrimination against employees, that United acted in bad faith and committed a willful ADEA violation. Stated otherwise, we may conclude under the circumstances here that Plaintiffs' showing of pretext—when considered alongside the evidence that the relevant United employees were aware of their obligation not to discriminate on the basis of age—established the willfulness of United's conduct.

In this regard, recall that Plaintiffs' pretext showing relied on casting doubt on United's nondiscriminatory rationales for its decision to investigate, discipline, and constructively discharge Plaintiffs. And the jury heard evidence that the relevant United employees—in taking these actions—knew that they were legally prohibited from discriminating against Plaintiffs on the basis of their age. Thus,

35

once the jury disbelieved United's rationales and credited Plaintiffs' version of events—as the jury's verdict on the ADEA liability question indicates—it could reasonably infer from United's awareness of the prohibition against age discrimination that United knew it was violating the law when it took the adverse actions that it did against Plaintiffs or, at the very least, that it recklessly disregarded such a possibility. As applied to the facts of this case, the Ninth Circuit's words ring true: "The jury was entitled to credit the [Plaintiffs'] evidence, which supported a conclusion that the discrepant (and perhaps, incredible) responses proffered by [United's agents] were unsuccessful attempts to mask a statutory violation." *Pape Lift*, 115 F.3d at 680.

All that said, we pause to clarify the scope of our holding. We are *not* saying that the evidence of willfulness in this case was abundant. It was not. As we have explained above, Plaintiffs failed to provide any direct evidence of age discrimination by United. Even though *Hazen Paper* instructs us that the absence of such evidence is not determinative, *see* 507 U.S. at 617, it is a notable weakness in Plaintiffs' willfulness showing. *Cf. Minshall*, 323 F.3d at 1283 ("[Employer's manager] . . . testified that she was instructed by [the company] not to hire anyone under the age of 40 to replace [the plaintiff]. From this evidence, the jury could reasonably conclude that [the employer] knew its decision not to renew [the plaintiff's] contract was in violation of the ADEA or acted with reckless disregard over the matter. Accordingly, the district court did

36

not err in granting [the plaintiff] liquidated damages."); *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 586 (9th Cir. 1993) ("conclud[ing] that [the plaintiff] sufficiently alleged willful violations of the ADEA" where, among other things, the plaintiff "alleged . . . that [two general mangers] willfully belittled her because of her age in front of customers and other employees"); 1 Ruzicho, et al., *supra*, § 5.6 ("The most willful end of the continuum often involves direct evidence . . . .").

Moreover, we do *not* hold that the willfulness standard will be satisfied in every instance where plaintiffs are able to establish pretext and that the employer's decision-makers were trained on and aware of the legal prohibition against age discrimination. *Cf. Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1104–05 (3d Cir. 1995) (Garth, J., concurring in part and dissenting in part) ("The Supreme Court and the courts of appeals have repeatedly recognized that Congress did not intend every violation of the ADEA to be a willful violation. In [*Thurston*], the Supreme Court rejected [plaintiff's] argument that a violation was willful whenever the employer knew the ADEA was 'in the picture' because that standard would eliminate the distinction between ordinary and willful violations." (quoting *Thurston*, 469 U.S. at 127–28)).

As we have noted, the willfulness inquiry is "fact-sensitive and individualistic." *Raytheon*, 716 F.3d at 146. Consequently, the outcome of the willfulness inquiry in one case—which turns in significant part on a plaintiff's

37

pretext showing—will not necessarily be susceptible of being readily mapped onto other cases that also involve significant pretext showings but different facts. *Cf. Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) ("[W]e hold that the Supreme Court's decision in *Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" (quoting *Reeves*, 530 U.S. at 143)); 1 Ruzicho, et al., *supra*, § 2:27 (noting that, in discerning pretext, the Supreme Court's "lesson is that each case must be considered on its unique facts and theories"). Therefore, the outcome in this case does not necessarily dictate the outcome in another.

In this regard, it is particularly significant that the relatively strong case of pretext that Plaintiffs demonstrated here and employed in support of their willfulness showing was in substantial part based on undermining the credibility of United's witnesses. As a consequence, in the context of the denial of a JMOL motion, our review of the jury's willfulness determination has been necessarily narrowly circumscribed because—as we have repeatedly noted—we are not at liberty to re-weigh witness credibility or otherwise second-guess the jury's determination on this matter. *See, e.g.*, *Eby Realty*, 396 F.3d at 1110; *Kenworthy*, 979 F.2d at 1468; *cf. Wilson v. AM Gen. Corp.*, 167 F.3d 1114, 1121 (7th Cir. 1999) (noting in the context of an ADEA pretext analysis, that "we are not quick

to overturn the jury's judgment on the credibility of [] witnesses, especially in an employment discrimination case 'where the result frequently turns on sensitive and difficult factual questions involving motive, thus often making the credibility of the witnesses decisive[]'" (quoting *Mathewson v. National Automatic Tool Co.*, 807 F.2d 87, 90 (7th Cir. 1986))).

Yet pretext showings will not always turn so heavily on witness credibility. *See, e.g.*, *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1984–85 (6th Cir. 1994) (noting that one means to show pretext, which is "of an entirely different ilk" than the showing that relies on directly attacking the credibility of defendant's neutral explanations, depends on demonstrating that "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup"), *abrogated on other grounds by Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009); *Tomasso v. Boeing Co.*, 445 F.3d 702, 709 (3d Cir. 2006) ("Even if a rational factfinder would have to conclude that these [age-neutral employer] rationales played *some* role in [plaintiff's] layoff, the factfinder would not have to conclude that they provide a *sufficient* explanation."); *see also* 1 Ruzicho, et al., *supra*, § 2:27 ("An alternative approach to proving pretext is evidence that discrimination was a more likely reason than even a factually supported legitimate, nondiscriminatory reason."); *cf. Reeves*, 530 U.S. at 147–48 (explaining that, although attacking the credibility of a defendant's witness is "probative of intentional discrimination"

39

which may be "persuasive" to a jury, such a pretext showing heavily reliant on undermining the credibility of an employer's justification may not "*always* be adequate to sustain a jury's finding of liability[,]" if, for instance, "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision"); 1 Ruzicho, et al., *supra*, § 2:27 ("The articulated reason is deemed pretextual because it camouflaged the ageist motive. . . . Proof that the employer's articulated reason was false may, *in a particular case*, reveal nothing more than the employer lied, perhaps about an improper or unlawful reason other than age discrimination." (emphasis added) (footnote omitted)). Accordingly, the outcome of our willfulness inquiry in another case where there is no direct evidence of age discrimination and the plaintiff's willfulness showing turns in significant part on its pretext evidence could well be different.

What we can say with confidence is that the evidence here does not "conclusively favor[]" United on the willfulness question. *Mountain Dudes*, 946 F.3d at 1130 ("Judgment as a matter of law is cautiously and sparingly granted and then only when the court is certain the evidence *conclusively* favors one party such that reasonable [people] could not arrive at a contrary verdict." (alteration in original) (emphasis added) (quoting *Bill Barrett*, 918 F.3d at 766)). Though it was not abundant, the evidence was sufficient for the jury to reasonably conclude that United acted willfully in discriminating against Plaintiffs on the basis of age. Stated otherwise, we conclude that Plaintiffs' distinct showing of

40

willfulness—which rested on the same universe of evidence that was before the jury on the question of ADEA liability—was sufficient to permit the jury to reasonably find that United acted willfully. Accordingly, the district court correctly denied United's motion for JMOL, insofar as it related to the jury's willfulness finding.

**B**

Finally, we turn to United's last contention: The district court erred in admitting Plaintiffs' emotional distress testimony because, in United's view, it was irrelevant and highly prejudicial evidence.

"We review for abuse of discretion a district court's denial of a rule 59(a) motion for new trial." *Engle*, 721 F.3d at 1216. Likewise, "[w]hen the issue of whether to grant a new trial 'hinges on the admissibility of evidence,' this court reviews the 'admission of the evidence for abuse of discretion.'" *Minshall*, 323 F.3d at 1283 (quoting *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1296 (10th Cir. 1998)). "Because evidentiary rulings are within the sound discretion of the district court, [we] will reverse only upon a 'definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *United States v. Chavez*, 976 F.3d 1178, 1193 (10th Cir. 2020) (quoting *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999)).

Our inquiry "does not end" with whether a district court abused its discretion, however. *Id.* at 1204. "To obtain a reversal for the allegedly erroneous admission of evidence . . ., an appellant also must make a showing of prejudice." *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1161 (10th Cir. 2017). In other words, even where the district court erroneously admits evidence, "we still may not grant relief if the district court's error was harmless." *Chavez*, 976 F.3d at 1204 (quoting *United States v. Washington*, 653 F.3d 1251, 1270 (10th Cir. 2011)). "An erroneous admission of evidence is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1212 (10th Cir. 2011) (quoting *United States v. Yeley-Davis*, 632 F.3d 673, 685 (10th Cir. 2011)). "Similarly, [we] may set aside a jury verdict due to erroneously admitted evidence only if [we] reasonably conclude[] that a trial without that evidence would have had a contrary result." *Racher*, 871 F.3d at 1161 (citing *Sanjuan*, 160 F.3d at 1296).

United argues it is entitled to a new trial because of the district court's allegedly erroneous admission of Plaintiffs' emotional distress testimony, which United says was prejudicial and irrelevant. At trial, the court overruled United's objection to the testimony, stating that Plaintiffs "ha[d] to be able to provide background evidence as to the constructive discharge claims[,]" and Plaintiffs' subjective reactions to their circumstances "provide[d] a context" for their

42

constructive discharge theory. Aplt.'s App., Vol. X, at 2531. While, as we have

noted, United has not specifically challenged on appeal the jury's finding of

constructive discharge, it still contends that Plaintiffs' emotional distress

testimony—which United refers to as "feelings" testimony—was irrelevant to the

objective constructive discharge inquiry.[12] Aplt.'s Opening Br. at 55–59. More

generally, United asserts the district court "abused its discretion" and violated

Federal Rule of Evidence 403 by allowing such testimony "[b]ecause the danger

of unfair prejudice, confusing the issues, and misleading the jury . . . vastly

outweighed any conceivable relevance." *Id.* at 62.

In response, Plaintiffs maintain that, at bottom, "[e]vidence that Plaintiffs

experienced a strong emotional reaction in response" to their conversations with

their supervisors regarding retirement supported their claim of constructive

discharge because it "made it more likely" that they did not voluntarily retire;

rather, United presented them with "an ultimatum": "retire[] immediately" or be

fired. Aplees.' Resp. Br. at 50. According to Plaintiffs, United "concede[d] that

Plaintiffs could testify about their subjective perception of their options during

the disciplinary process," which would have been "almost impossible" to do

"divorced from their mental state." *Id.* at 52. In this regard, Plaintiffs contend

---

[12]     *See, e.g.*, *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1269 (10th Cir. 2015) (applying "an objective standard" to a constructive discharge claim); *Sandoval v. City of Boulder*, 388 F.3d 1312, 1325 (10th Cir. 2004) (same); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (same).

43

that "[p]recluding [them] from addressing their emotional reactions during the disciplinary process would have wrongly prohibited Plaintiffs from explaining why they retired rather than wait[ed] to be fired"—that is, wrongly prevented them from offering "a critical factor driving each Plaintiff's decision-making process." *Id.* Accordingly, Plaintiffs reason that the court properly admitted this evidence as relevant to their claim of constructive discharge.

Plaintiffs also contend that, even if the emotional distress testimony were improperly admitted, the testimony's effect, if any, would have been harmless. Significantly, "[t]he jury was instructed 'that the fact that either Plaintiff may or may not have suffered . . . emotional [upset, pain and suffering, or any other similar] effects ha[d] no bearing on whether [United] violated the ADEA.'" *Id.* at 54 (omission and second alteration in original) (quoting Aplt.'s App., Vol. XV, at 3732). Plaintiffs urge us to presume the jury followed this instruction and contend that United "provides no basis to believe" that the jury disregarded it. *Id.* On the question of whether the emotional distress testimony was harmful, Plaintiffs further point out that United never sought a limiting instruction regarding it. *Id.* at 54 n.10. Finally, Plaintiffs emphasize how "minimal" their emotional distress testimony was over the five-day trial. *Id.* at 55. Taking all these arguments together, Plaintiffs conclude that United fails to show that this testimony, if prejudicial at all, warranted a new trial. *Id.* at 55–56.

We conclude that United's arguments for reversal are unavailing. The district court concluded its assessment of United's request for a new trial the following way: "United has provided no basis from which the [c]ourt can conclude that the emotional distress evidence had a substantial effect on the outcome or that a contrary result would have occurred if such evidence had been excluded." Aplt.'s App., Vol. V, at 1170. We agree.

Put succinctly, even if the district court erred in some manner in admitting Plaintiffs' emotional distress testimony, its admission did not have a substantial influence on the outcome or cause us to have grave doubts about this matter. Therefore, there is no reversible error, and the district court properly denied United's motion for a new trial.

As the district court reasoned, "the emotional distress evidence was minimal over the context of the five-day trial," *id.* at 1167, and we believe that, acting reasonably, the jury would have been hard pressed to find it inflammatory or the basis for any special sympathy for Plaintiffs. Indeed, United's own description of the purportedly objectionable testimony reveals just how inconsequential it was. United directs us for instance to Ms. Stroup's testimony that her call with Mr. Dodge informing her of United's termination decision was "very stressful" and that it made her "upset and confused." Aplt.'s Opening Br. at 54 (quoting Aplt.'s App., Vol. XI, at 2639, 2668 (Tr. Jeanne Stroup Test., dated Feb. 18, 2018)). Ms. Stroup also testified that she felt she was "treated

45

completely unfairly" and, based on this feeling, concluded "there had to be an underlying reason why [she] was being treated so harshly." *Id.* at 54–55 (quoting Aplt.'s App., Vol. XII, at 2704 (Tr. Jeanne Stroup Test., dated Feb. 27, 2018)). Mr. Lee offered similar unremarkable testimony, stating he was stressed and "shocked" by United's actions and that he had the feeling United simply did not care about him. *Id.* at 55 (quoting Aplt.'s App., Vol. XII, at 2870, 2903 (Tr. Ruben Lee Test., dated Feb. 27, 2018); *Id.* Vol. XIV, at 3393 (Tr. Ruben Lee Test., dated Mar. 1, 2018)).

Cutting to the heart of the matter, we do not see how any such statements could have inflamed the jury against United or engendered such sympathy for Plaintiffs that it would have substantially affected the jury's verdict. To be sure, United states in conclusory fashion that "[t]he jury heard and observed Plaintiffs' delivery (itself emotional) of all this testimony, which undoubtedly played to jurors' sympathies and factored into their verdict." *Id.* But United fails to give us persuasive grounds—based on the record before us—on which to conclude that the jury would have reached a different outcome had it *not* heard such testimony.

Furthermore, the lack of potential for the emotional distress testimony to substantially affect the outcome is underscored when we consider Plaintiffs' essential theory of the case. Plaintiffs sought to demonstrate that United willfully violated the ADEA in large part by showing that purported irregularities in United's investigative and disciplinary process signaled that United's reasons for

46

its actions were a pretext for age discrimination.  Yet Plaintiffs' testimony about their emotional distress in response to United's decision to terminate them bears virtually no logical relationship to such pretext evidence regarding purported irregularities.  Indeed, Plaintiffs presented the emotional distress testimony in an effort to persuade the jury regarding a distinct matter—that is, regarding whether they were constructively discharged.  Whether the emotional distress testimony was actually relevant to this matter or not,[13] it is clear to us that it had only a limited substantive role to play in advancing Plaintiffs' theory of the case. Accordingly, the potential for this evidence to substantially affect the jury's consideration of the evidence and its verdict seems negligible.  Indeed, this is even more true when this legal point is combined with the not surprising fact that this tangential testimony—as the district court indicated—occupied comparatively little time over the course of the five-day trial and was far from inflammatory.

Lastly, there is yet another reason why we are confident that the admission of Plaintiffs' emotional distress testimony did not have a substantial influence on the outcome: the jury instructions.  The district court specifically limited the jury's use of the emotional distress testimony in the following way: "Damages

---

[13]     Citing our decision in *Sanchez v. Denver Pub. Sch.*, 164 F.3d at 534, the district court determined that Plaintiffs' emotional distress testimony was relevant to the constructive discharge issue.  *See* Aplt.'s App., Vol. V, at 1168 ("[H]ow Plaintiffs felt at that time also provides context for the jury to decide whether they felt compelled to resign.").  We have no need to definitively opine on this matter.

should not and may not be awarded for any emotional upset, pain and suffering, or any similar such effects; such damages are not recoverable under the ADEA." Aplt.'s App., Vol. XV, at 3732 (Jury Inst. 20).  And we may presume that the jury followed this instruction.  *See Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1248 (10th Cir. 1998) ("presum[ing] the jury followed the court's instruction to disregard the emotional distress evidence in the absence of certain findings"); *accord United States v. Hamilton*, 587 F.3d 1199, 1219 (10th Cir. 2009). Consequently, like the district court, we believe that "[a]ny prejudice that [the emotional distress testimony] may have caused United was mitigated," to a significant extent, by the jury instructions.  Aplt.'s App., Vol. V, at 1170.

Thus, we conclude that, even if the district court erred in some manner in admitting Plaintiffs' emotional distress testimony, its admission did not have a substantial influence on the outcome or cause us to have grave doubts about this matter.  This conclusion is not altered by United's procedural attack on the admission of the evidence.  United contends that Plaintiffs should have been precluded from introducing emotional distress testimony based on representations that they made during the discovery process.  United notes the following events in support of this argument: (1) Plaintiffs objected to United's discovery requests seeking information and documents relating to their psychological or emotional state and treatment by healthcare providers; (2) based on this objection, United did not pursue further discovery on this issue; and (3) United later moved in

48

limine to preclude emotional distress testimony under Rules 402 and 403 of the Federal Rules of Evidence, which the district court denied. *See* Aplt.'s Opening Br. at 53–55, 59–61.

United argues that the district court "ignored" Plaintiffs' discovery-related misconduct, which ran afoul of (1) Federal Rule of Civil Procedure 37(c)(1), because Plaintiffs purportedly failed to abide by this rule's duty to supplement pretrial disclosures under Federal Rule of Civil Procedure 26(e), and (2) the doctrine of judicial estoppel, because "Plaintiffs decided to reverse their prior position [during discovery] that emotional distress evidence was irrelevant and inadmissible," when they proceeded to trial. *Id.* at 59–61.

For their part, Plaintiffs contend their emotional distress testimony was separate from any pretrial discovery relating to emotional damages or mental health records; therefore, they did not contravene the discovery rules by presenting emotional distress testimony at trial. Further, Plaintiffs reject United's judicial estoppel argument and contend that United "waived this argument by failing to seek to compel the discovery after [the] Plaintiffs objected"—that is to say, because United "never sought judicial intervention, . . . judicial estoppel is inapplicable." Aplees.' Resp. Br. at 53.

We may dispose of United's procedural attack summarily. Irrespective of whether the district court committed any error in ignoring Plaintiffs' purported discovery-related misconduct—and our review of the record, at first blush,

49

suggests to the contrary—we already have concluded here that the admission of the emotional distress testimony did not have a substantial influence on the outcome or cause us to have grave doubts about this matter. In other words, we already have concluded that there was no harmful effect on the jury's verdict from this testimony that would warrant reversal. Consequently, it strikes us as beside the point how or why the testimony made its way into the trial; even if it were due to district-court error, that would not alter the fact the testimony's impact was legally harmless. Consequently, United's procedural attack on the admission of the evidence does not affect our conclusion. That is, the court did not err in denying United's motion for a new trial, insofar as United challenged the admission of this testimony.

## III

For all these reasons, we conclude United's challenges on appeal are meritless. As a result, we uphold the district court's orders denying United's JMOL motion and its Rule 59 motion for a new trial and **AFFIRM** the court's judgment.